[No. 36305. En Banc. May 23, 1962.]

THE CITY OF TACOMA, *Respondent*, v. THE TAXPAYERS OF TACOMA, *Appellants*, THE STATE OF WASHINGTON *et al.*, *Intervenor-appellants.**

*Reported in 371 P. (2d) 938.

*Richard R. Hodge, Earl D. Mann, Lee Olwell, John Hedrick, The Attorney General, Stephen M. Reilly* and *Ernest M. Furnia, Assistants,* and *Smithmoore P. Myers, Special Assistant,* for appellants.

*Marshall McCormick, Paul J. Nolan,* and *Quinby R. Bingham,* for respondent.

HILL, J.—For a history of the prior "Cowlitz" litigation see *State of Washington Department of Game v. Federal Power Comm.* (1953), 207 F. (2d) 391 (C. A. 9th); *Tacoma v. Taxpayers* (1953), 43 Wn. (2d) 468, 262 P. (2d) 214; *Tacoma v. Taxpayers* (1957), 49 Wn. (2d) 781, 307 P. (2d) 567; and *Tacoma v. Taxpayers* (1958), 357 U. S. 320, 2 L. Ed. (2d) 1345, 78 S. Ct. 1209.

Suffice it to say that at this point the City of Tacoma, a municipal corporation armed with a license issued November 28, 1951, by the Federal Power Commission which authorized it to build two dams[1] on the Cowlitz River[2], has proceeded to erect one of the dams and is ready to proceed with the other in violation of the expressed desires of a considerable segment of the people of the state of Washington[3], the will of the legislature[4], and the will of the people of the state[5], that no dams be built on that river more than

---

[1]Mossyrock (to be 325 feet above tail water and 510 feet above bedrock), and Mayfield (to be 185 feet above tail water and 240 feet above bedrock).

[2]A navigable stream, but which for its entire course is within the state of Washington.

[3]The Attorney General of the State of Washington, representing the State Game Department, appeared in opposition to the issuance of the permit to build the dams and, together with the Washington State Sportsmen's Council, petitioned for the review of the license by the Court of Appeals (207 F. (2d) 391).

[4]Laws of 1949, chapter 9, p. 38, "An Act relating to the protection of anadromous fish life in the rivers and streams tributary to the lower Columbia River," which prohibited the erection of dams over 25 feet in height in all streams and rivers tributary to the Columbia River downstream from McNary Dam; and reserved such streams as an anadromous fish sanctuary against undue industrial development.

[5]Initiative No. 25, adopted by the people of the state of Washington at the November election in 1960, effective December 8, 1960 (Laws

25 feet in height. Ironically enough, the City of Tacoma did not go into the federal courts to secure a determination[6] that its authority to proceed with the dams on the Cowlitz River, under its license from the Federal Power Commission, was unaffected by Initiative No. 25 with its prohibition of any person, including municipal corporations, from building dams more than 25 feet in height. Instead it invoked the jurisdiction of the courts of the state, whose public policy it had persistently flouted, to again give assurance to prospective bond purchasers[7] that the city is em-

---

of 1961, chapter 4), which sought to accomplish the same purpose as Laws of 1949, chapter 9, by prohibiting any person from erecting any dam over 25 feet high in any of the streams referred to in that act and defining "person" to include a municipal corporation.

We quote § 1 of the initiative:

"For the purpose of conserving the State's fishery resources the powers of any person authorized to construct or operate dams or to appropriate water in the State are hereby limited in that no such person shall construct, complete or operate, either for himself or as an agent or independent contractor for another, any dam or other obstruction over 25 feet high on any tributary stream of the Columbia River downstream from McNary Dam, including the Cowlitz River and its tributaries, within the migration range of anadromous fish as jointly determined by the Directors of Fisheries and Game, . . . *nor shall any such person obtain or use a federal license for such purpose.* . . ." (Italics ours.)

[6]Tacoma could have maintained such an action. See *Ex parte Young* (1908), 209 U. S. 123, 52 L. Ed. 714, 28 S. Ct. 441. See extensive annotation entitled "What actions arise under the Constitution of the United States so as to vest jurisdiction of Federal Courts" (1950), 13 A.L.R. (2d) 390 to 611.

In *Doud v. Hodge* (1956), 350 U. S. 485, 100 L. Ed. 577, 76 S. Ct. 491, it is held that a three-judge federal district court has jurisdiction under 28 U.S.C. §§ 1331, 2281 and 2284 of a suit in equity to enjoin enforcement of a state statute on grounds of alleged repugnancy to the federal constitution, even though the state courts have not yet rendered a clear or definitive decision as to the meaning or federal constitutionality of the statute.

See also *Florida Lime & Avocado Growers v. Jacobsen* (1960), 362 U. S. 73, 4 L. Ed. (2d) 568, 80 S. Ct. 568 (with annotation pp. 1931 to 1965).

[7]The present action is a declaratory judgment action brought by the City of Tacoma under the provisions of RCW 7.24 and 7.25 for the purpose of determining the right of the city—in view of the enactment of Initiative No. 25—to issue and sell its revenue bonds for the completion of the Cowlitz project.

powered by its license from the Federal Power Commission to disregard the law of this state. The right of the city to maintain the action is unquestioned.

The court in the first Cowlitz case[8], recognized that the federal government's constitutional authority to regulate commerce and navigation gave it the right—acting through the Federal Power Commission—to issue a license to the City of Tacoma to construct dams which would be in excess of 25 feet in height (the limit imposed by the state in the exercise of its police power to preserve the fishery resources of the state).

Implicit in both the first and second[9] Cowlitz cases is the holding that since the City of Tacoma was a municipality empowered to construct, maintain, and operate power facilities[10], and had a license from the Federal Power Commission empowering it to construct the Mossyrock and Mayfield dams on the Cowlitz River, the state—even by the exercise of its police power—could not prevent the building of such dams.

The trial court, in the present case, very ably spelled this all out again in its findings, conclusions of law, and judgment.

The defendant taxpayers, the intervenor State of Washington, and the other intervening taxpayers all appeal.

The appellants now concede the federal government's "paramount" power to determine the height of dams, but take the position on this appeal that the city is a "creature" of the state, hence subject to its control; and the state, by adopting Initiative No. 25 (see footnote 5), has divested the city of its right to proceed to build the dams.

---

[8]43 Wn. (2d) 468, 262 P. (2d) 214.

[9]49 Wn. (2d) 781, 307 P. (2d) 567.

[10]RCW 35.92.050 empowers the cities of the state to ". . . construct, condemn and purchase, purchase, acquire, add to, maintain and operate works, plants, facilities for the purpose of furnishing the city or town and its inhabitants, and any other persons, with gas, electricity, and other means of power and facilities for lighting, heating, fuel, and power purposes, public and private, with full authority to regulate and control the use, distribution, and price thereof, . . ."

This court had proceeded on a variation of that theory (and, if we may say so, a much more logical one) in the second Cowlitz case, in which we held that the city had no power to condemn property, except such as the legislature granted to it; and that it had been granted no power to condemn state property, already dedicated to a public use; in short, that the "creature" could not condemn the "creator's" property, when the "creator" was using it for a public purpose, i.e., a fish hatchery.

The Supreme Court of the United States reversed this court[11], without meeting that issue, by saying that the state and its citizens were foreclosed by the judgment in the Court of Appeals[12] from litigating further the power and the authority of the City of Tacoma to proceed under its Federal Power Commission license to build the dams. The Supreme Court quoted the following language from the Court of Appeals decision[12],

" ' . . . we conclude [13] that the state laws cannot prevent the Federal Power Commission from issuing a license or bar the licensee from acting under the license to build a dam on a navigable stream since the stream is under the dominion of the United States. . . .' "

█ We summarized the situation, with painful accuracy, when—following the reversal and remand—we entered a judgment in the second Cowlitz case, which read in part as follows:

"1. The United States has exclusive and paramount jurisdiction over navigable waters, under the commerce clause of the United States Constitution, and, therefore, any State laws are inapplicable to the Mayfield and Mossyrock [Cowlitz dams] Hydroelectric Project insofar as the same conflict with the provisions of the Federal Power Act or the terms and conditions of the appellant's license for said project, or

---

[11]*Tacoma v. Taxpayers* (1958), 357 U. S. 320, 2 L. Ed. (2d) 1345, 78 S. Ct. 1209.

[12]*State of Washington Department of Game v. Federal Power Comm.* (1953), 207 F. (2d) 391 (C.A. 9th), cert. den. 347 U. S. 936, 98 L. Ed. 1087, 74 S. Ct. 626 (1954).

[13]This conclusion was based on: *First Iowa Hydro-Electric Coop. v. Federal Power Comm.* (1946), 328 U. S. 152, 90 L. Ed. 1143, 66 S. Ct. 906.

*which would enable the State of Washington or any State official thereof to exercise a veto over said project, . . ."* (Italics ours.)

We would have thought that this language was sufficiently explicit to answer the present question for bond counsel, and, in the words of the United States Supreme Court in reversing this court, that attacks on the right of the City of Tacoma to proceed with the construction of these dams were "impermissible collateral attacks upon" the final judgment of the United States Court of Appeals.

Apparently the sovereign State of Washington recognized that "paramount jurisdiction" meant "paramount jurisdiction." Despite the fact that Initiative No. 25 became effective December 8, 1960, and clearly prohibited any person, which included the City of Tacoma, from constructing or completing any dam over 25 feet in height on the Cowlitz River, the state stood by (from December 8, 1960, until June 8, 1961) while the City of Tacoma rushed the completion of the Mayfield dam (185 feet above tail water and 240 feet above bedrock) without seeking to stop what it urged in its answer as an intervenor, and now urges on this appeal, to be a violation of the initiative.

This matter comes before the courts again, not because anybody attempted to stop Tacoma's construction of a 185-foot dam, now practically completed, but because Tacoma needed more money to construct the 325-foot Mossyrock dam. Prospective investors in Tacoma's revenue bonds, and their timorous counsel, were apparently not certain that "paramount jurisdiction" meant "paramount jurisdiction," so Tacoma—to reassure them—brought this declaratory judgment action (filed May 12, 1961). Not until Tacoma commenced this action was there any suggestion, implemented by legal action, that Tacoma should be enjoined from violating Initiative No. 25.

The trial court, by its judgment, gave the necessary reassurance to the prospective investors and their counsel: That the federal government still had "paramount jurisdiction" over navigable streams, despite the passage of Initia-

tive No. 25 by the voters of the state. We quote, approvingly, three conclusions of law made by the trial court:

"Congress had the constitutional power to enact the Federal Power Act, and in so doing it intended to exercise its full jurisdiction to authorize the Federal Power Commission to supersede state laws purporting to prohibit or limit the construction of dams on navigable streams. By passing the act, Congress preempted the entire field and authorized the Power Commission to issue licenses for such construction upon such conditions as it deemed proper, and the Federal Power Commission, in issuing its license to the Plaintiff [city of Tacoma], exercised that right and delegated to the Plaintiff, its licensee, as its agent and the agent of the Federal Government, the right and power to complete and to thereafter operate the Cowlitz Project in accordance with the terms and conditions of its license." (Conclusion of Law VIII)

"There are no state laws, measures or regulations, including Initiative 25 (Chapter 4, Laws of 1961) that limit, control or affect in any way, or that bar the rights of the Plaintiff to finance, construct, complete and operate the Cowlitz Project under the provisions of the Federal Power Act and in accordance with the terms and conditions of its Federal Power License (Project No. 2016.)" (Conclusion of Law IX)

"The United States has exclusive and paramount jurisdiction over navigable waters under the commerce clause of the United States Constitution and under the supremacy clauses of the United States and Washington State Constitutions, and, therefore, any state laws, measures or regulations, whether such laws be in the form of prohibitions or curtailment or limitation of powers, or in any other form, are inapplicable to the Mayfield and Mossyrock hydroelectric project insofar as the same are in conflict with the provisions of the Federal Power Act or the terms and conditions of Plaintiff's license for said project or which would enable the State of Washington or any State official thereof or the citizen voters to exercise a veto over said project." (Conclusion of Law X)

We agree, as heretofore indicated, that the decision of the United States Court of Appeals (see footnote 12) was res judicata of the issues raised. We agree, for the further reasons indicated in the foregoing conclusions of law, that

the trial court properly dismissed the cross-complaints, which challenged the right of the City of Tacoma to proceed under its license to construct the Cowlitz project and erect the Mayfield and Mossyrock dams, as provided in that license.

■ However, we do not agree with the trial court's further conclusion that Initiative No. 25 is unconstitutional. It is a constitutional exercise of the state's police power to protect its fishery resources, and valid except to the extent that it is superseded by the exercised "paramount jurisdiction" of the United States with reference to the Cowlitz project. There are, doubtless, nonnavigable streams tributary to the Columbia River[14] below the McNary dam where the initiative could be effective; and, perhaps, navigable streams where it could be enforced until such time as the federal government should choose to exercise its "paramount jurisdiction" or "dominant servitude."[15]

We go no further than to hold that Initiative No. 25 is superseded and is inoperative when it comes into conflict with the exercised "paramount jurisdiction" of the United States to determine who shall build dams on navigable streams and at what heights.

Within the limitations indicated, the judgment of the trial court—that Initiative No. 25 did not in any way affect the right or authority of the City of Tacoma, under its license from the Federal Power Commission, to proceed with the Cowlitz project and to erect and operate the Mossyrock and Mayfield dams in accordance with such license—is affirmed.

WEAVER, FOSTER, HUNTER and HAMILTON, JJ., concur.

DONWORTH, J. (concurring in the result)—My reasons for affirming the trial court's judgment are stated in the majority opinion in the first Cowlitz case (43 Wn. (2d) 468,

---

[14]For a decision relative to state rights on nonnavigable streams tributary to the Columbia River, see *Federal Power Comm. v. Oregon* (1955), 349 U. S. 435, 99 L. Ed. 1215, 75 S. Ct. 832.

[15]*Federal Power Comm. v. Niagara Mohawk Power Corp.* (1954), 347 U. S. 239, 98 L. Ed. 666, 74 S. Ct. 487.

262 P. (2d) 214 (1953)), and in the dissenting opinion in the second Cowlitz case (49 Wn. (2d) 781, 307 P. (2d) 567 (1957)).

The dissenting opinion (49 Wn. (2d) at page 802) was based on three grounds (1) that the majority opinion in the first Cowlitz case had established the law of the case, (2) that the decision of the Court of Appeals in 207 F. (2d) 391, reviewing the proceedings before the Federal Power Commission in granting the license to the City of Tacoma (respondent here) and upholding the commission's action, was res judicata [16], and (3) that, under the Federal Power Act, the City of Tacoma had authority to condemn state-owned property already devoted to public use.

The sole question now before us is whether the enactment of Initiative No. 25 by the voters of this state effective December 8, 1960, prohibited the further exercise of the city's authority to complete the construction of the Mayfield and Mossyrock dams on the Cowlitz River under the license granted it by the Federal Power Commission in 1951 (Project No. 2016).

By Initiative No. 25, the State of Washington attempted to accomplish the same purpose as Laws of 1949, chapter 9, which was held invalid in the first Cowlitz case in 1953. The only difference is that Initiative No. 25 purports to prohibit any person, including municipal corporations, from building dams in the area described therein more than twenty-five feet in height. The object of Initiative No. 25 is to divest the City of Tacoma, as a municipal corporation of the State of Washington, of its authority to construct, maintain, and operate these dams which it had acquired in 1951 from the Federal Power Commission under the provisions of the Federal Power Act.

If such a statute had been enacted prior to the issuance and acceptance of the license in 1951, a very different question would have been presented. But it is not disputed that, for more than forty years prior to 1951, the City of Tacoma

[16]See *Tacoma v. Taxpayers,* 357 U. S. 320, 2 L. Ed. (2d) 1345, 78 S. Ct. 1209 (1958).

had statutory authority from the State of Washington to operate works, plants, and facilities for furnishing gas, electricity, and other means of power. See RCW 35.92.050 and prior acts. The Federal Power Commission made a finding to the effect that the city had complied with all applicable state laws necessary to carry out the purpose of a license for the project. See finding No. 53, which is quoted at page 803 of 49 Wn. (2d).

The history of the proceedings leading to the issuance of the license by the commission and of the subsequent litigation clearly shows that the state cannot now exercise a veto over the rights acquired by the city and the government under the Federal Power Act.

This historical background is set forth in the dissenting opinion in the second Cowlitz case (49 Wn. (2d) at page 802, *et seq.*). I would, in the interests of brevity, incorporate that opinion by reference in this concurring opinion.

The issue presented to this court on this appeal is controlled by the unanimous decision of the United States Supreme Court which reversed the decision of the majority of this court in the second Cowlitz case. In *Tacoma v. Taxpayers,* 357 U. S. 320, 2 L. Ed. (2d) 1345, 78 S. Ct. 1209 (1958), the Supreme Court held that the question of whether the city, under its license, had power to condemn state-owned land already devoted to public use was foreclosed by the decision of the Court of Appeals in *State of Washington Department of Game v. Federal Power Comm.,* 207 F. (2d) 391 (C.A. 9th) (1953).

It is my opinion that that decision also compels our affirmance of the trial court's judgment in this case.

The Supreme Court, after holding that, under the Federal Power Act, the Court of Appeals for the Ninth Circuit had exclusive jurisdiction to affirm, set aside or modify, in whole or in part, orders of the Federal Power Commission, said:

"The State participated in the hearing before the Commission. It there vigorously objected to the issuance of the license upon the grounds, among others, '[t]hat the reservoirs which would be created by the proposed dams would inundate a valuable and irreplaceable fish hatchery owned

by the State' and, hence, necessarily require the taking of it by the City under the license sought; that the City had not complied with the applicable laws of the State respecting construction of the project and performance of the acts necessarily incident thereto (note 11); and that the City was not authorized by the laws of the State to engage in such business. The Commission rejected these contentions of the State and made all the findings required by the Act to support its order granting the license (note 9) including the finding that:

" 'The applicant . . . has submitted satisfactory evidence of compliance with the requirements of all applicable State laws insofar as necessary to effect the purposes of a license for the project; and it is a municipality within the meaning of Section 3 (7) of the Act.'

The State then petitioned the Commission for a rehearing, reviving the foregoing contentions and raising others. The petition was denied.

"Thereafter, the State, following the procedures prescribed by § 313(b), petitioned the proper Court of Appeals for review of the Commission's findings and order. After full hearing, that court rejected all contentions there raised by the State, did not disturb any of the Commission's findings, and affirmed its order without modification. *Washington Department of Game v. Federal Power Comm'n*, 207 F. 2d 391. It made particular mention of, and approved, the Commission's finding, as rephrased by the court, that the City had submitted 'such evidence of compliance with state law as, in the Commission's judgment, would be "appropriate to effect the purposes of a Federal license on the navigable waters of the United States." ' *Id.*, at 396.

"Moreover, in its briefs in the Court of Appeals, the State urged reversal of the Commission's order on the grounds that the City 'has not shown, nor could it show, that [it] has availed itself of . . . *any right to take or destroy the property of the State* of Washington [and that] Tacoma, as a creature of the State of Washington, *cannot act* [under the license] in opposition to the policy of the State or in derogation of its laws.' (Emphasis added.) In rejecting these contentions—that the City does not have 'any right to take or destroy property of the State' and 'cannot act' in accordance with the terms of its federal license—the Court of Appeals said:

" 'Again, we turn to the First Iowa case, supra. There, too, the applicant for a federal license was a creature of the state and the chief opposition came from the state itself.

Yet, the Supreme Court permitted the applicant to act inconsistently with the declared policy of its creator, and to prevail in obtaining a license.

" 'Consistent with the First Iowa case, supra, we conclude that the state laws cannot prevent the Federal Power Commission from issuing a license *or bar the licensee from acting under the license* to build a dam on a navigable stream since the stream is under the dominion of the United States.' *Id.,* at 396. (Emphasis added.)

We think these recitals show that the very issue upon which respondents stand here was raised and litigated in the Court of Appeals and decided by its judgment. But even if it might be thought that this issue was not raised in the Court of Appeals, it cannot be doubted that it could and should have been, for that was the court to which Congress had given 'exclusive jurisdiction to affirm, modify, or set aside' the Commission's order. And the State may not reserve the point, for another round of piecemeal litigation, by remaining silent on the issue while its action to review and reverse the Commission's order was pending in that court—which had 'exclusive jurisdiction' of the proceeding and whose judgment therein as declared by Congress 'shall be final,' subject to review by this Court upon certiorari or certification. After the Court of Appeals' judgment was rendered, the State petitioned this Court for a writ of certiorari which was denied. 347 U. S. 936.

"These were precisely the proceedings prescribed by Congress in § 313(b) of the Act for judicial review of the Commission's findings and order. They resulted in affirmance. That result, Congress has declared, 'shall be final.' "

After referring to certain language in the Court of Appeals' decision to the effect that the Commission had no power to adjudicate certain questions relating to the city's power to act under the license after its issuance (such as indebtedness limitations),[17] the Supreme Court continued:

". . . We believe that respondents' construction of this language is in error. The questioned language expressly refers to possible 'indebtedness limitations' in the

---

[17]The bonds being considered in this case are utility revenue bonds payable solely out of the gross revenues of the utility as provided in RCW 35.92.100 and prior acts.

No general municipal indebtedness is involved.

See *Twichell v. Seattle,* 106 Wash. 32, 179 Pac. 127 (1919); *Asia v. Seattle,* 119 Wash. 674, 206 Pac. 366 (1922).

City's Charter and 'questions of this nature,' not to the right of the City to receive and perform, as licensee of the Federal Government under the Federal Power Act, the federal rights determined by the Commission and delegated to the City as specified in the license. That this was the meaning of the court, if its meaning might otherwise be doubtful, is made certain by the facts that the court did not disturb a single one of the Commission's findings; affirmed its order without modification; and said, in the sentence immediately preceding the questioned language: 'Consistent with the First Iowa case, supra, we conclude that the state laws cannot prevent the Federal Power Commission from issuing a license *or bar the licensee from acting under the license* to build a dam on a navigable stream since the stream is under the dominion of the United States.' *Id.*, at 396. (Emphasis added.)

"The final judgment of the Court of Appeals was effective, not only against the State, but also against its citizens, including the taxpayers of Tacoma, for they, in their common public rights as citizens of the State, were represented by the State in those proceedings, and, like it, were bound by the judgment. . . .

"We conclude that the judgment of the Court of Appeals, upon this Court's denial of the State's petition for certiorari, became final under § 313(b) of the Act, and is binding upon the State of Washington, its Directors of Fisheries and of Game, and its citizens, including the taxpayers of Tacoma; and that the objections and claims to the contrary asserted in the cross-complaints of the State, its Directors of Fisheries and of Game, and the Taxpayers of Tacoma, in this bond validation suit, were impermissible collateral attacks upon, and *de novo* litigation between the same parties of issues determined by, the final judgment of the Court of Appeals. Therefore, the judgment of the Supreme Court of Washington is reversed and the cause is remanded for further proceedings not inconsistent with this opinion."

As I read this decision, it means that, since the Federal Power Commission made its finding that:

" 'The Applicant . . . has submitted satisfactory evidence of compliance with the requirements of all applicable State laws insofar as necessary to effect the purposes of a license for the project; and it is a municipality within the meaning of Section 3(7) of the Act.' "

and the Court of Appeals approved his finding (and also all sixty-five other findings), the Cowlitz project became a federal project upon the issuance and acceptance of the license by the city in 1951. The relative rights and obligations of the United States and the City of Tacoma became fixed at the time as provided in the Federal Power Act. See, particularly, sections 3, 4 (e), 6, 9 (b), 10 (a), 14, 23 (b), and 27 thereof.

The following portion of the dissenting opinion in the second Cowlitz case, in my opinion, correctly describes the relationship between the United States and the city as it has existed since 1951 and as it presently exists:

"Without further reviewing the provisions of the Federal power act, it is apparent that Congress intended to and did exercise its full power under the commerce clause in providing for the licensing of the projects described therein. When the power commission has made a finding as required by § 9 (b) that the licensee has complied with state laws with respect to the right to engage in the business of developing, transmitting, and distributing electric power and any other business necessary to effect the purposes of the licensee under the act, then the licensee becomes the agent of the Federal government in regard to the project. Upon the issuance of the license, all rights and obligations of the licensee are derived from congressional constitutional powers, and not those of the state where the project is located. See *First Iowa* case [328 U. S. 152, 90 L. Ed. 1143, 66 S. Ct. 906].

"The project for which the license is issued is a Federal project and is to be considered as if it were to be constructed and operated by the government itself. The government has an option to buy the project works at the end of the license period, as provided in § 14 of the act. Every detail of the project must be carried out by the licensee in strict accordance with the terms of the license and the maps and drawings identified therein. The comprehensive plan adopted by the power commission for the development of the waterway may not be deviated from by a licensee without permission of the commission."

Ever since the Supreme Court held, in 1946, in the case of *First Iowa Hydro-Electric Co-op. v. Federal Power Comm.*, 328 U. S. 152, 90 L. Ed. 1143, 66 S. Ct. 906, that the

United States has plenary power over the use of the water of navigable streams and may deny the privilege of constructing an obstruction in those waters, the states may not regulate or license such matters.

The power of the United States in the premises being paramount, and the state having no power to exercise any control over navigable streams, it necessarily follows that the state may not interfere with or frustrate the functioning of a municipal licensee under its federal license nine years after its issuance and acceptance by attempting, through Initiative No. 25, to deprive the municipality of its authority to construct dams over twenty-five feet in height on the Cowlitz River.

Since the Federal Power Commission, in its finding No. 53, found that the City of Tacoma was a municipal corporation within the meaning of section 3 (7) of the power act, and that it had submitted satisfactory evidence of its compliance with all applicable state laws to effect the purpose of a license for project No. 2016, and since that finding was sustained by the Court of Appeals (207 F. (2d) 391), no court of the State of Washington can re-examine and decide a question which has been finally determined by the only court of competent jurisdiction qualified to decide it, to wit, the Court of Appeals of the Ninth Circuit. Subsequent legislation by the state cannot change the status which the city attained in 1951 under the Federal Power Act.

In my opinion, Initiative No. 25 is ineffective to prohibit the City of Tacoma from proceeding to complete its two dams under its license from the Federal Power Commission (project No. 2016). I do not think that we are called upon in this case to discuss the validity or effect of Initiative No. 25 as to other projects than the one now before us.

I concur in affirming the judgment of the trial court, which (for the second time) upholds the validity of the utility bonds of the City of Tacoma, authorized by Ordinance No. 14386, as amended.

FINLEY, C. J., concurs with DONWORTH, J.

OTT, J. (dissenting)—In this appeal, we are concerned with this single issue: Can this court approve an act of a municipal corporation which, under the laws of this state, is ultra vires?

The City of Tacoma is a municipal corporation, organized and existing by virtue of the laws of the State of Washington. Being an entity created by the legislative bodies of the State of Washington, its powers are limited to those which the legislature or the people, by initiative, have authorized it to perform. *Othello v. Harder*, 46 Wn. (2d) 747, 284 P. (2d) 1099 (1955).

At the November election in 1960, the people of the State of Washington, by Initiative No. 25, limited to 25 feet the height of dams that Washington municipal corporations, engaged in the hydroelectric power business, would be permitted to construct on the Cowlitz River and certain other streams, "nor shall any such person [municipal corporation] obtain or use a federal license for such purpose." Laws of 1961, chapter 4, RCW 75.20.110, 75.20.120.

The City of Tacoma requests this court to approve bonds for the construction of a dam on the Cowlitz River which the Federal Power Commission has authorized it to build, and which will exceed 25 feet in height.

The Congress of the United States has only such powers as are enumerated in Art. 1, § 8, of the United States Constitution. All other legislative authority is reserved unto the several states. U. S. Const. Tenth Amendment. The laws of the State of Washington which define the powers of its corporations cannot be amended by resolution or by grant of a license from the Federal Power Commission. The powers of municipal corporations in Washington can be increased or diminished only by Washington legislative enactments. Const. Art. 2.

The fact that the Federal Power Commission has granted to the City of Tacoma a right to construct a higher dam on the Cowlitz River than the sovereign State of Washington has authorized it to build, does not legalize that which is illegal and in excess of the authority granted to the city by the sovereign.

Since the proceeds of the bonds are to be used by the municipal corporation for purposes which the people have expressly forbidden the corporation to perform, the trial court and this court have no power to approve the bonds as legal obligations of a corporate entity of this state.

Nor do I find any merit in the contention that, since the limitation was enacted by the people of the State of Washington subsequent to the grant of the license by the Federal Power Commission, the application of equitable principles requires that the city's bonds be now approved to provide funds to construct the dam. Both the city and the Federal Power Commission were fully aware, at the time the license was granted and construction commenced, that the city had not acquired title to the land it contemplated inundating or arranged for adequate financing of the proposed hydroelectric project. Inability to accomplish either of these essential conditions precedent would prevent the city from completing the facility. The statutory prohibition against the construction of high dams was in effect for more than five months before the city commenced this action to have its contemplated financial program approved by the courts. Equitable principles cannot be applied when their application is in direct conflict with a statutory mandate. *Norlin v. Montgomery,* 59 Wn. (2d) 268, 273, 367 P. (2d) 621 (1961), and cases cited.

In my opinion, the judgment should be reversed.

ROSELLINI, J., concurs with OTT, J.